Please the court. My name is Lynn Thomas. I'm appearing on behalf of the appellant William J. Tway. It's my understanding that Mr. Martell does not plan to make a separate argument in this case. So I don't know whether we get 20 minutes or 10. Well you can take 10 if you want. Why don't we go for 10 since he's not going to And if you need a little extra time, we'll give it to you. Thank you, your honor. This is a case involving a tax fraud prosecution against Mr. Tway and Mr. Ford on account of activities in an organization which was nonprofit organization called Free Speech Foundation, which operated under Idaho law, a series of bingo games. I think it's important to mention that this is a nonprofit corporation because the state statutes are a little confusing with respect to charitable purposes and nonprofit corporations. Sometimes a nonprofit organization is referred to in the statutes as having a charitable purpose, but under state law the nonprofit purposes of the organization really subsumed under that title. This organization was a nonprofit organization. The Secretary of State's certificate certified that and its activities. But it had to qualify for tax exempts. It did have a tax exempt. It had to qualify under the federal system. That's correct. That's what this case is all about. That's right, because the government alleged, and in the view of the district court, proved that there had been a conspiracy to violate the federal statute relating to obstructing and impairing the Internal Revenue Service in its function of collecting federal taxes. Mr. Ford and Mr. Tway were both convicted of the conspiracy count. Mr. Tway was convicted of aiding and abetting in the filing of these false returns. The thrust of the whole thing was that the program services amount on line 13 of the tax exempt returns, forms 990, overstated certain amounts. These were monies that had been given by the organization under its program services obligations for research grants to Mr. Tway and Mr. Ford for the production of a book and for scholarships. Mr. Thomas, let me ask you a couple of questions which lead me to really to standard of review and how we deal with this particular matter. Is it true that the defendants waived their right to a jury trial? That's correct. Is it true they also waived their right to specific findings of fact and conclusions of law? That's correct. So what I have to do is I, because we didn't have any of that, I have to review the record to suggest construing the evidence most favorable to the prosecution that the judge couldn't have found those facts. Isn't that where I am? Essentially, that's correct. And isn't it also true that even though there was a motion to dismiss the indictment which was filed and in that the pre-indictment delay that you now allege on appeal was not a ground for the motion? I am not sure that that's a fact. I'll tell you it is a fact. It is? Yes. Is there something that wasn't reported in there? I had thought at the beginning of this process that there had been... I mean, you did file a motion to dismiss the indictment. You just say the indictment doesn't sufficiently allege the offenses, government failed to show probable cause, and the prosecutor committed misconduct. Had nothing in there about pre-indictment delay whatsoever. That's correct with respect to that motion. What we're saying now is that there's a due process problem with the inferences drawn from materials that were not available because of pre-indictment delay. So I'll just pass by altogether the pre-indictment delay and suggest to the court there's a due process problem which the court can take up at any time without respect to whether there was any preservation of the issue by virtue of its having been included in the motion. But one of the things that I wanted to highlight here and that I wanted to go into most specifically is the tax liability aspect of section 72062. The cases of this circuit, and in particular United States v. Salerno, make it pretty clear that the defendant's conduct must have affected tax revenue. This was a non-profit tax-exempt organization. The evidence which was unrebutted was to the effect that there wouldn't have been any tax liability, notwithstanding its tax-exempt status. Furthermore, the government... If you assume that it was in fact a valid non-profit corporation and that it was not in fact, as the district court judge found, a corporation that existed to profit the two defendants, their personal profits? I don't think that that the evidence would suggest that they profited from the program services except to the extent that they were given these grants, which were in fact contingent and might eventually have... In the notes, the contingent notes that they saw? That's correct. If you believe that they could provide research grants, why were the promissory notes hidden from the accountant? Were they given to the accountant? I don't believe... I think his testimony was largely that the defendant didn't recall so much about whether he had been given the promissory notes. He knew about them, the attachments to Forms 990 that he apparently prepared, made reference to the promissory notes and described how they were going to function, that the periodically there would be a requirement for review of the grant process and that promissory notes had been executed in order to guarantee the performance under the grants. So the account knew something about it. I'm not sure I quite followed that. So it was a grant, but they had to put up a promissory note in order to get the grant? That's correct. They executed contingent promissory notes which said, in fact, if we don't read the book, we have to give the money back. So it really wasn't a grant? It was not a grant in the normal sense. I guess my worry is that when I'm looking at the district judge now, he hasn't got a jury, given pre-widespread stuff. In Idaho, I've heard a D.J. say, let the evidence in for what it's worth. I don't even have to worry about it. We just go forward and find out whether there's sufficient evidence to make the case. And they're ones that are determining whether they're guilty or not guilty. And they don't even have to give you a specific finding of fact or a specific conclusion of law. All they've got to do is come to the most favorable way to the prosecution. Where can I find that no trier of fact, what's your best case that no trier of fact could have found on false returns, or aiding or bedding, or the agreement, or the knowing and willful, or the overt act? I mean, I went through then trying to find all the evidence here and trying to see if I could find just no evidence to help the old D.J. along. And I didn't even have to see if he even agreed with me, based on how you went at it. What's your best case? Well, the best case is United States v. Salerno, which says, in fact, this isn't even a crime. If you don't have a tax liability, you don't get to get a conviction under 7206-2. If you're assuming away the fact that this was not, in fact, a non-profit foundation, you're just assuming that finding by the district court away. Well, it was a non-profit organization under state law. It was authorized to do what it did with respect to the bingo revenues. Well, it was registered with the Secretary of State as such, but it did not conduct itself in that manner. It did not conduct itself in a manner of a profit-making corporation. It distributed its bingo revenues as required by the state law. All of these revenues were put out in exactly the way the law required, which is, I guess, it depends on how you look at the evidence. I thought it was somewhat indicative that given what we have here, the evidence would surely show that Ford had income of $225,000 currency and $100,000 in currency to make personal investments. We got all kinds of stuff in here. Tway used family members' accounts to run his businesses, gave information. I mean, I guess Judge Wardle's question is pretty straight. Sure, but there just isn't any evidence that Mr. Tway got any money except for these grants, and he had executed notes to guarantee his performance under these research grants. Let me ask you, so the defendants have been released from prison? He is still on a probationary term. He has been released from prison. And I assume there's other collateral consequences. I'm sorry? I assume there's other collateral consequences from the sentence that make this appeal not moot, in other words. That would be correct. Thank you. Thank you, counsel. I'll reserve a few seconds. Thank you. May it please the court. My name is Serena Case Hargrove, and I represent the United States in this matter. I'm here in George Bright's center, the trial counsel's stead. He, due to his busy trial schedule, was not able to attend this argument. Mr. Daly, the CPA who created the tax returns that were central to this case, testified that when he prepared the returns for Free Speech Foundation in the years 1999 and 2000, he was asked, were you aware of the promissory notes from the defendants, or to the defendants from the organization? He said no. This is on page, government's excerpt of record 119 to 120. Then the prosecutor asked him, when were you first aware of them? And he said within the last year. In preparation for your testimony on behalf of Mr. Tway and Mr. Ford, he said, if that's the way you want to describe it, yes. He was not aware of the promissory notes until this action began. At that point, apparently Mr. Ford and Mr. Tway gave them to him, and he looked at them at that time. It's interesting, too, the promissory notes which were supposedly for grants to Mr. Ford and Mr. Tway account for but a small part of the program service item on grants for both years. So even if we assume that those promissory notes were in fact given to Mr. Ford and Mr. Tway, that doesn't take care of the entire problem for them because there's still a significant amount of money remaining to be explained. Furthermore, the grants were in direct contravention of the articles of incorporation that Mr. Tway himself drafted. Those articles contained non-injurement provisions. And as an officer of that non-profit or charitable organization, as officers they were not allowed to receive such grants under their own rules. Furthermore, they were never reported on the Form 990s. When those documents were filed, there's a place to report amounts that are reported. Mr. Daley, the CPA, also testified that he was told to use the category research grants for all checks to cash. And that's what we had a great deal of here were checks written out to cash. The government, in establishing that program services funds were significantly overstated in the 1999 and 2000 Form 990s, evaluated and reconstructed books for the entire cart full of bank records that the government had with it and had summarized. Five or six bank accounts were clearly used by the Free Speech Foundation. And there were many, many checks written out to cash. Indeed, Dr. Weeks, the president of the foundation in some of those years, testified that he was asked by Mr. Tway to sign blank checks for the foundation. And he didn't think anything of that. He was really a president sort of in name only. He testified that he was there to make sure that they satisfied the state rules for officers. After this extensive searching inquiry into bank records and interviewing witnesses, IRS agents could find absolutely no record of any scholarship given to anyone in the years that were covered by the 1999 and 2000 tax returns. The government had to prove a negative, had these program services amounts, which the defendants alleged went to scholarships and to grants. And the government had to show that, in fact, they didn't go to that. Did the government put on evidence tracing the cash to Mr. Tway and Mr. Ford personally? I mean, were they able to trace those checks and the cash amounts to bank accounts controlled or in the name of Tway or Ford? No, Your Honor, not directly. There were not checks written to Mr. Tway or Mr. Ford. What they were able to see was that there were tremendous number of checks written to cash by the foundation. And Mr. Ford had tremendous amounts of cash. There was also testimony that Mr. Tway operated using primarily cash. His finances were very difficult to trace because he didn't keep records. He didn't keep bank accounts in his own name. There was testimony that he used cash as well. Mr. Ford, because he did keep traditional bank accounts and did file taxes and so on, they were able to do an accounting whereby they evaluated all of his known income and all of his known expenditures. And that's where they found the $225,000 extra dollars. He gave at one point $100,000 in cash to the owner of a nightclub in Boise and then returned and gave him $50,000 more in cash. That was part of that $225,000. So what we know is that the defendants had significant amounts of cash. We know that the corporation issued many, many checks to cash. And from that inferences can certainly be drawn reasonably. And I believe that's what Justin did. Were they ever prosecuted for their personal tax returns? They were not. They were not. And Mr. Tway, it's interesting, Mr. Tway, by not filing returns and by not keeping any records at all, it would be hard to establish the amount of income he ever received. I mean, through all the accounting that the IRS agents did, they had a very difficult time. So it's unclear that he would even meet the requirements for the personal income tax. Mr. Ford certainly might, but he was not prosecuted for that. I'm happy to answer any other questions if you have them. I have a question. Then I'll sit down. All right. Thank you very much, counsel. All right, you can have one minute. Just a couple of things, if it pleases the court. I wanted to mention the non-annulment provisions of the Articles of Incorporation. I think the government is mistaken in saying that these grants were a violation of those. The government's excerpt of record, pages 18 and 19, contains the Articles of Incorporation, and they provide that the corporation should be authorized to pay reasonable compensation for services rendered and make payments and distributions in furtherance of the purposes established in these articles, and that income of the corporation may be devoted to payment to directors or officers for service rendered. So I don't think it's accurate to say that the book grants were somehow or other improper under the Articles of Incorporation. The other point that I want to make is that Mr. Ford's $225,000 dealings in the Free Speech Foundation bingo account didn't have anything to do with Mr. Tway, who was surprised to in the account and then took it out. It seems to be irrelevant to the principal purposes of this prosecution. And finally, I'd say the fact the government found it hard to trace anything is also sort of irrelevant. What we have here is a kind of inference-building process in which the government really says, in the circumstances of this case, we can't find anything, so you have to believe all or disbelieve all of the affirmative evidence of innocence that was presented on behalf of Tway and Ford. We think the conviction needs to be reversed. All right. Thank you, counsel. Thank you. The United States V. Board and Tway will be submitted, and this session of this court is adjourned for today.
judges: Wardlaw, Paez, Smith N. R.